IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**TRACY L. JACKSON**                                                                                    **PLAINTIFF**

**VERSUS**                                              **CAUSE NO. 3:21-CV205-MPM-RP**

**DESOTO COUNTY, MISSISSIPPI,**
**and BENNIE HOPKINS, in His Individual Capacity**            **DEFENDANTS**

**ORDER**

This cause comes before the court on the motion of defendants DeSoto County, Mississippi and Bennie Hopkins for summary judgment pursuant to Fed. R. Civ. P. 56.  Plaintiff Tracy L. Jackson has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion should be granted in part and denied in part.

This is, *inter alia*, a Title VII hostile work environment and retaliation case filed by plaintiff against Desoto County and its Planning and Building Department Director Hopkins.  In her complaint, plaintiff alleges that she was subjected to severe or pervasive sexual harassment on the part of Hopkins and that, when she complained about it to the County, she was subjected to unlawful retaliation, up to and including her December 30, 2020 termination.  In the court's view, it is plaintiff's retaliation claim which is, quite arguably, her strongest in this case, and it will accordingly discuss that claim first.

To make a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity; (2) an adverse employment action occurred; and (3) a causal link exists between the protected activity and the adverse employment action. *See Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 678 (5th Cir. 2021). In seeking dismissal of plaintiff's retaliation claim, defendant argues in its brief that:

> Plaintiff's retaliation claim against DeSoto County fails for two (2) reasons. First, Plaintiff cannot show a causal connection between her reporting the alleged sexual harassment and her reprimand or termination. Second, and assuming for purposes of summary judgment only that Plaintiff can establish a prima facie case of retaliation based on her termination, she has failed to rebut DeSoto County's legitimate, nondiscriminatory reason for terminating Plaintiff.

[Reply brief at 11].

These strike this court as constituting essentially the same argument, namely that plaintiff is unable to establish fact issues regarding whether she was terminated on the basis of her having reported sexual harassment. In its brief, defendant argues that it, acting through its Board of Supervisors, terminated plaintiff on the basis of a recommendation of its Human Resources Director Carla Crockett. Specifically, defendant asserts that:

> [T]he undisputed testimony from members of the DeSoto County Board of Supervisors conclusively reveals that the Board, based upon Crockett's recommendation, voted to terminate Plaintiff after she continuously refused to return to work. Supervisor Michael Lee testified that Plaintiff was terminated "for not showing up to work." Likewise, Supervisor Jessie

> Medlin testified that the board voted to terminate Plaintiff because "she didn't come back to work." Plaintiff has no evidence to controvert the fact the she was terminated solely for job abandonment, with no connection to her allegations against Defendant Hopkins.

[Reply brief at 6].

It is thus plain that Crockett played a very prominent role in this case, and, as discussed below, this court does not find this role to have been a positive one. In this court's long experience in dealing with allegations of employment discrimination and retaliation, it has encountered two primary forms of HR managers. Very commonly, HR managers properly understand their role as being to ensure that federal and state laws are followed and to make sure that their employees are protected from unlawful conduct by their supervisors and co-workers. While this court hopes and believes that such individuals constitute a majority of such professionals, it has, to be certain, encountered a less praiseworthy category of HR managers who seem to understand their job duties very differently. These managers seem to regard their role as being to "put out fires" on behalf of their employer and to ensure that employees do not unduly "rock the boat" by making allegations of discrimination or harassment.

Defendant's own description of the facts of this case raise questions in this court's mind as to whether Crockett falls in the latter category of HR managers. In its brief, defendant describes the allegations of harassment which were presented to Crockett as follows:

3

> Plaintiff testified that at some point in 2020, Hopkins tried to kiss her on the elevator. Approximately six (6) months prior to her termination, Plaintiff testified that Hopkins asked her to stay after work on two occasions. On one of these occasions, according to Plaintiff, Hopkins first asked if he could show Plaintiff his penis to get her opinion and then Hopkins said "if [she] ever wanted to stay after work to let him know and he would make [her] feel better." Regarding the second incident, Hopkins allegedly told Plaintiff "[y]ou know you can always stay after work with me." To clarify, Plaintiff explained that Hopkins asked her to stay after work twice and asked if she wanted to see his penis once.
>
> Hopkins testified under oath that he did not commit any of the conduct alleged by the Plaintiff. Additionally, Plaintiff has openly admitted that Defendant Hopkins never grabbed her or exposed himself to her. On or about August 27, 2020, Plaintiff reported the alleged harassment in a written statement to the DeSoto County Sheriff's Department. When asked what caused Plaintiff to make her report at that time, Plaintiff explained that "the penis thing is what really got me, him asking me to stay after work is what got me. All the stuff leading up that (sic) was tolerable." The Sheriff's Department notified Carla Crockett, DeSoto County's HR Director, a few days later on or about August 31, 2020.

[Defendant's brief at 3-4, record citations omitted].

In describing Crockett's reaction to this report of harassment, defendant writes in its brief that:

> Crockett immediately launched a comprehensive investigation into Plaintiff's claims. This included multiple interviews with Plaintiff and Hopkins, as well as personal interviews with several employees inside and outside of the Planning Department. After approximately two (2) weeks of investigating, Crockett determined that Plaintiff's claims were unsubstantiated and insufficient to warrant a change to the Planning Department structure or personnel. Crockett notified Plaintiff of this determination via email on Monday, September 14, 2020. Plaintiff left work the same day she received Crockett's email and did not return the next day. Shortly after returning to work on September 16, 2020, Plaintiff left and notified Crockett that she was checking herself into Parkwood Behavioral Health.

> On Saturday, September 19, 2020, Plaintiff notified Crockett via email that she had been released from impatient care and would begin daily outpatient therapy the following Monday. At that point in time, Plaintiff had exhausted all of her vacation and sick time. As such, Plaintiff requested that Crockett help her apply for FMLA and Short-term disability.

[*Id.* at 4].

Defendant thus concedes that Crockett was confronted with an employee who made serious accusations of sexual harassment against Hopkins and that the employee was sufficiently traumatized by these alleged acts of harassment that she sought inpatient mental health counseling. Moreover, defendant does not assert that Crockett's investigation proved these allegations to be false, contending instead that the allegations were "unsubstantiated." *Id.* Defendant's characterization of the allegations against Hopkins fails to account for the fact that, by her own admission, Crockett's investigation revealed accusations against him by not one, but *three*, current or former employees. Indeed, in a September 7, 2020 letter to the Board of Supervisors regarding the status of her investigation into "sexual harassment statements," Crockett informed Board members that, aside from plaintiff, former employees Dixie Lamb and Christie Thomas had also made allegations against Hopkins. [Exhibit 8 at 2].

Defendant is thus unable to claim that, at the time it fired plaintiff, it was unaware of the specifics of these corroborative allegations against Hopkins.

In so stating, this court notes that plaintiff has submitted a September 3, 2020 e-mail from Thomas to Crockett and members of the Board of Supervisors in which this former employee informed them that:

> Yes, Bernie said some VERY inappropriate things to me, the things he used to say literally made me sick to my stomach, I cried every day because of Bennie and the sick things he used to say to me. The stuff I had to put up with put me in a depression. I didn't come forward because I already knew the outcome, seeing Bennie was really good friends with Dixie, Vickie Richmond and Vanessa for that matter. There wasn't a day that went by where Bennie didn't say something inappropriate to me. He is discussing [sic] to say the least. I started missing work on a daily basis, I dreaded coming into work but made myself. He would whisper something sexual to me all the time. He always talked about his penis, he once asked me if he could lick my p****. He would call me after hours, I ignored his calls. It was something new every day! He told me how fine I was every day. He would tell me how good my ass looked every day. I ignored him, until I couldn't take it anymore and left the county. I confided in a friend [co-worker] and my family about this. They begged me to report it but like I explained to them, nothing would happen and I would be the one out the door. There's a lot more that he said to me, but this is just to give you an idea of how he would talk to me every single day. He told me numerous times not to tell anyone about anything he said to me.

[Exhibit 21].

In her September 7, 2020 letter to the Board, Crockett referenced the fact that "on Thursday morning, Ms. Christie Thomas sent a statement to all of us outlining her claims against Bennie," [*id.* at 2], and there is accordingly no doubt that Crockett and the members of the Board were aware that there were serious allegations of harassment against him made by multiple current or former employees. In the court's view, this fact renders Crockett's subsequent actions in

this case all the more indefensible. In its brief, defendant concedes that, after learning that plaintiff had mentioned her allegations against Hopkins to a co-worker, Crockett wrote her a warning in which she raised the specter of her being terminated for making supposedly false allegations:

> On October 9, 2020, while Plaintiff was on FMLA leave, Crockett issued Plaintiff a written reprimand after Crockett was informed that Plaintiff had repeated her sexual harassment allegations against Hopkins to County employee Dennis Sides. The reprimand informed Plaintiff that her conversation with Sides violated County Policy 21.404.11.1 Id. According to Crockett, the reprimand was a "written warning." Importantly, the "written warning" did not affect Plaintiff's job duties, compensation, or benefits. Instead, it warned that "[a] future violation . . . may lead to disciplinary action up to and/or including suspension or termination of employment." Crockett testified that it was her decision to reprimand Plaintiff.

[Brief at 5].

In the court's view, it should be a grave embarrassment to Desoto County that the employee whom it designated to handle complaints of sexual harassment would threaten with termination an employee who had strong allegations of sexual harassment, merely because she repeated those allegations to a co-worker. In the court's view, these are the actions of an HR Director who is interested in sweeping allegations of harassment under the rug, not in acting upon them. The fact that, at the time she took these actions, Crockett was well aware that plaintiff was under mental health treatment based upon the harassment she claimed to have suffered renders her actions all the more inexcusable.

In her letter of reprimand, Crockett informed plaintiff that, in telling a co-worker about the alleged harassment she suffered, she had violated the following county policy:

> In reviewing our county policies, you are in violation of Policy 21.404.11. This is considered Class B misconduct. This misconduct appears to be willful and could be damaging to the County, or other employees. The policy states that originating or spreading false or malicious statements concerning an employee of the County … will not be tolerated and are in violation of County employment standards. . . . A future violation of the standards of conducted listed in 21.400 may lead to disciplinary action up to and/or including suspension or termination of employment.

[Ex. 44-9 at 1]. In so informing plaintiff, Crockett implicitly found that the allegations against Hopkins were not merely unproven but outright "false" and/or "malicious." Once again, Crockett so stated with full knowledge of the fact that at least two other former county employees had raised very similar allegations against him. In its brief, the County makes no attempt to argue that plaintiff's allegations in this case are either "false" or "malicious," and it thus appears that even it disagrees with Crockett's decision to reprimand plaintiff on this basis.

In her letter to the Board, Crockett also acknowledged that there was an "employee outside of the planning department," whom she identified in her deposition as Elizabeth Riley, [Crockett Dep. at 34] who was "able to add some validity to the statements made by [plaintiff]." According to Crockett, Riley told her that "sometime around Christmas, [plaintiff] came to her upset and crying, said Bennie had made inappropriate comments about her body and what he wanted to

do with her." [*Id.* at 34]. When asked by Crockett if she found plaintiff's allegations to be trustworthy, Riley answered in the affirmative. [*Id.*] Under these circumstances, any characterization of the allegations against Hopkins as "unsubstantiated" appears questionable indeed, and any attempt to classify them as affirmatively "false" or "malicious" seems completely indefensible. Crockett nevertheless saw fit to reprimand plaintiff based on such an indefensible finding.

    This court notes that one of the former employees who alleged misconduct on the part of Hopkins was Lamb, who once worked in the very same HR department which Crockett now supervises. Lamb provided a statement to the Sheriff's Department which stated in part that:

> Bennie Hopkins, Director of Planning, made inappropriate comments to me in regards to his Big Black Dick on several occasions. He came into the HR Department where I worked almost daily. Comments about my chest were made to me and how I looked. I would just brush them off.

[Ex. "18," Lamb's Statement to Sheriff's Department]. When Lamb was asked whether plaintiff had ever told her that Hopkins said sexually inappropriate things to her, she responded, "I am sure she probably did . . . maybe five or ten [times]." [Ex. "17," Lamb depo., p. 12]. This court notes that Crockett made reference to Lamb's allegations against Hopkins in her September 7 letter to the Board of Supervisors, [docket entry 52-8 at 1] and she was thus plainly aware of them at the time she accused plaintiff of making "false" and/or "malicious" allegations.

9

In the court's view, facts such as those discussed above would lead most defendants to urgently seek to settle the case, rather than seek to defend their conduct in a summary judgment motion. Moreover, while defendant was within its rights in filing the instant motion, its discussion of the law in this context is disingenuous. Indeed, in discussing plaintiff's retaliation claim, defendant writes that:

> Regarding the first element, protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. See 42 U.S.C. § 2000e–3(a). As such, Defendant DeSoto acknowledges that Plaintiff's reporting of the alleged sexual harassment constitutes a protected activity. Thus, Plaintiff satisfies the first element of a prima facie case of retaliation. Under the second element, "[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Welsh v. Fort Bend Indep. Sch. Dist*., 941 F.3d 818, 824 (5th Cir. 2019) (*quoting McCoy*, 492 F.3d 551)). Conversely, "[a]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action." *Id.* (*quoting Pegram v. Honeywell, Inc.,* 361 F.3d 272, 282 (5th Cir. 2004)). Plaintiff's reprimand for violating County Policy did not constitute an adverse employment action. Instead, the reprimand merely informed Plaintiff that her conversation with a fellow county employee violated County Policy and warned that "[a] future violation . . . may lead to disciplinary action up to and/or including suspension or termination of employment." *See* Ex. I at 1. Importantly, the reprimand did not affect Plaintiff's job duties, compensation, or benefits. Thus, as a matter of law, Plaintiff cannot establish the second element of a prima facie case for retaliation based on the reprimand.

[Brief at 20-21]

In so arguing, defendant badly mis-reads the Fifth Circuit's holding in *Welch* by citing the "ultimate employment decision" requirement as being applicable to

Title VII *retaliation* claims. *Id.* In reality, the Fifth Circuit in *Welch* made it clear that the "ultimate employment decision" requirement is only applicable to Title VII *discrimination* claims, and that a different rule applies in retaliation cases. Specifically, the Fifth Circuit stated that:

> For purposes of Title VII's anti-retaliation provision, the Supreme Court has held that an adverse employment action is defined slightly more broadly than the term is defined in the employment discrimination context. *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 67–68, 126 S.Ct. 2405. Specifically, a plaintiff seeking to establish a retaliatory adverse employment action "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

*Welsh*, 941 F.3d at 826.

Thus, according to the very decision cited by defendant, Title VII retaliation plaintiffs must only demonstrate that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* This court finds it difficult to believe that any employee would not find being essentially called a liar and threatened with termination to be "materially adverse," and there are thus clearly fact issues regarding whether the October 9 reprimand constituted actionable retaliation under federal law.

This court notes parenthetically that the *en banc* Fifth Circuit appears, at this moment, poised to overrule the "ultimate employment decision" requirement even

in the employment *discrimination* context. *See Hamilton v. Dallas Cnty.*, 42 F.4th 550, 557 (5th Cir.), reh'g *en banc* granted, opinion vacated, 50 F.4th 1216 (5th Cir. 2022). Indeed, in *Hamilton*, the panel noted that the Fifth Circuit's "ultimate employment decision" requirement was an outlier among the federal circuits and urged that it be overruled by the *en banc* court. Specifically, the panel wrote in *Hamilton* that:

> The strength of the allegations here—direct evidence of a workforce-wide policy denying full weekends off to women in favor of men—coupled with the persuasiveness of *Threat*, *Chambers*, and *James*, make this case an ideal vehicle for the *en banc* court to reexamine our ultimate-employment-decision requirement and harmonize our case law with our sister circuits' to achieve fidelity to the text of Title VII.

*Hamilton*, 42 F.4th at 557. Judging by the granting of rehearing *en banc*, it appears that the full Fifth Circuit is seriously considering following the panel's recommendation. Regardless of whether it chooses to do so, it is abundantly clear that the "ultimate employment decision" requirement is inapplicable to plaintiff's *retaliation* claim in this case, as defendant's own authority makes clear.

      This court therefore finds that the October 9 reprimand is sufficient to create fact issues regarding the existence of a "materially adverse" retaliation against plaintiff for having reported harassment by Hopkins. Of course, plaintiff also alleges that she was *terminated* for having reported Hopkins' misconduct, and this court concludes that triable jury issues exist in this regard as well. In contending otherwise, defendant argues that it fired plaintiff for having refused to return to

work,[1] and it is certainly entitled to so argue before a jury at trial. In concluding that triable jury issues exist in this regard, however, this court places considerable weight on the fact that the Board acted based on Crockett's recommendation. Once again, plaintiff has what this court regards as very strong claims that Crockett committed unlawful acts of retaliation in her October 9, 2020 reprimand, and, that being the case, it is very difficult to state that there are no fact issues regarding whether a termination mere weeks later on Crockett's recommendation was likewise the result of unlawful retaliation.

In the court's view, the County's decision regarding whether to fire plaintiff for her stated reluctance to return to work should have considered the fact that it had before it an employee who had every reason to believe that she was confronted with an "old boy's network" protecting Hopkins which was resolved to punish those employees who "rocked the boat." Indeed, it appears to this court that, after the October 9 reprimand, plaintiff had every reason to suspect that the problem was not merely Hopkins, but *the County itself*. Under these circumstances, the mere fact that the County encouraged plaintiff to apply for jobs in a different department arguably does not serve to fully resolve these concerns, and it was, quite arguably,

---

[1] Defendant notes that "[o]n December 14, 2020, Crockett notified Plaintiff of three job postings outside of the Planning Department and encouraged her to apply if interested." *See* Ex. F at 13. Crockett explained that Plaintiff would need to fill out an application and submit a resume. *Id.* at 14. Plaintiff never advised Crockett as to whether she would accept the Board's 90-day offer, and Plaintiff did not apply for any of the County's openings. *Id.* at 15.

incumbent upon it to take additional steps to make amends and to address plaintiff's reasonable concerns. In so stating, this court notes that, if it had received Crockett's October 9, 2020 threat of termination for having mentioned Hopkins' harassment to a co-worker, then it would not have been eager to return to work for the County either.

The perception that the County was hostile towards complaints of harassment appears to have been widespread. As quoted previously, Thomas stated that her friends "begged me to report" the harassment by Hopkins, but "like I explained to them, nothing would happen and I would be the one out the door." [*Id.*] The Board was thus aware of this perception that there was a network and culture at the County which protected sexual harassers, and this court believes that it should have considered this fact in deciding whether to fire plaintiff for her reluctance to return to work. The fact that Crockett had already committed acts which can reasonably be regarded as retaliation renders this issue even clearer, and it is quite arguable that, at the time the County fired plaintiff, it should have been in damage-control mode for its own misconduct rather than seeking to fire an employee whom it had already treated very badly. Thus, while this court acknowledges that plaintiff's termination claims face certain factual hurdles arising from her stated reluctance to return to work, it concludes that a jury should decide whether she is able to surmount these hurdles.

This court further concludes that the serious nature of the allegations against Hopkins suffices to establish genuine fact issues regarding whether plaintiff was the victim of "severe or pervasive" sexual harassment in this case. Defendant argues that it is entitled to rely on the *Faragher/Ellerth* defense in response to the plaintiff's hostile work environment claims, but this court emphasizes that this defense is only available to those employers who have taken good faith steps to prevent and remedy sexual harassment. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 765, 767 (1998). The facts previously discussed in this order give this court grave doubts regarding whether Desoto County can count itself among the employers who have taken such good faith steps.[2] Indeed, the very fact that the County chose to hire and retain Crockett as its designated representative for HR matters is sufficient to give this court pause in this regard. Defendant's motion to dismiss plaintiff's hostile work environment claims will therefore be denied.

This court does agree with defendant that plaintiff's state law claims for malicious interference with business relations and intentional infliction of

---

[2] This court further notes that it has serious doubts whether *Faragher/Ellerth* applies at all in this case, in light of the U.S. Supreme Court's decision in *Vance v. Ball State University*, 570 U.S. 421 (2013). In *Vance*, the Supreme Court held that the *Faragher/Ellerth* standard only applies to "supervisors," which it defined as those who have the power to "hire, fire, demote, promote, transfer, or discipline" their victim. It is far from clear that Hopkins qualifies in this regard, and it appears to this court that a simple negligence standard may instead apply in this context. This court will resolve this issue at trial, if necessary.

emotional distress are due to be dismissed. In so ruling, it notes that, on multiple occasions, it has expressed its disapproval of what it finds to be the overuse of the malicious interference with employment cause of action and/or intentional infliction of emotional distress (IIED) claims in employment discrimination and retaliation cases. In *Pegues v. Mississippi State Veterans Home*, for example, this Court wrote that:

> In the last few years, this court has increasingly seen the torts of malicious interference with employment relations and/or malicious interference with contract being asserted as companion claims of sorts to various federal employment discrimination and § 1983 claims. The theory appears to be that any violation of federal law in the employment context also constitutes malicious conduct on the part of a supervisor, thereby subjecting them to individual liability for malicious interference with employment relations. However, this court strongly doubts that it was the Mississippi Supreme Court's intent to have the malicious interference cause of action serve as a "catch all" tort in the employment discrimination context.... Barring some indication from the Mississippi Supreme Court otherwise, this court will be extremely reluctant to conclude that the malicious interference tort was intended to serve as a duplicate state law remedy for cases where an employee is alleged to have acted with a motivation already prohibited by federal anti-discrimination laws. In so stating, this court notes that federal law has developed its own detailed body of law for courts to use in addressing allegations of employment discrimination and, unlike most states, Mississippi has no comparable body of state anti-discrimination law. While this absence may be regarded by many as regrettable, the fact remains that the malicious interference cause of action was simply not designed to deal with a subject matter as delicate and complex as workplace discrimination.

*Pegues*, 2017 WL 3298684, at *4-5 (N.D. Miss. Aug. 2, 2017).

This court has repeatedly made this holding in cases filed by counsel for plaintiff, and, in so doing, it has challenged him to provide Mississippi Supreme

Court precedent which indicates that that Court intends for Mississippi tort claims to be used in the manner which he urges. As in the prior cases in which counsel has raised such claims, he has failed to offer precedent which this court finds to sufficiently address its concerns in this regard. It strikes this court that, if it were to accept counsel's invitation to recognize potential state tort law liability in garden-variety employment discrimination cases such as this one, based on amorphous torts such as malicious interference and IIED, it would remove much of the predictability and precision which exists in the law in this area and make it exceedingly difficult to rule upon these claims, either on summary judgment or at trial. This court therefore concludes that, while it believes that plaintiff has asserted strong Title VII claims in this case, that statute provides the potential basis for her recovery in this case, and not Mississippi tort law.

In light of the foregoing, it is hereby ordered that defendant's motion for summary judgment is granted as to plaintiff's state law claims, but it is denied as to her Title VII retaliation and hostile work environment claims.[3] Given that Title VII provides for no liability against individual employees such as Hopkins, his motion for summary judgment will be granted.

---

[3] This court does agree with defendant that plaintiff's sexual harassment claims are best regarded as hostile work environment claims, and not "quid pro quo" claims. While plaintiff does make rather half-hearted efforts in her brief to argue that this is a quid pro quo case as well, [response at 24], she fails to offer any authority which would support this conclusion.

This, the 2nd day of November, 2022.

                                                    /s/ Michael P. Mills
                                                    UNITED STATES DISTRICT JUDGE
                                                    NORTHERN DISTRICT OF MISSISSIPPI